in New York and New Jersey, Mr. Karen Kern. May it please the Court, Lawrence Kern from our terminal's appellant. With the Court's permission, I'd like to reserve five minutes for rebuttal. That request will be granted. Thank you, Your Honor. Your Honor, as this appeal calls on this Court to apply the Supreme Court's decision in Polar Tankers to enforce the Tonnage Clause against the Port Authority of New York and New Jersey. In Polar Tankers, the Supreme Court explained and taught us on what basis and what criteria the Tonnage Clause applies. And these criteria are present here. First, is the imposition by a state entity, like it is by the Port Authority of New York and New Jersey here. Second, is it vessel-related, that is, for the privilege of trading in a port. Vessel-related? Vessel-related. Doesn't it say vessel? It doesn't say vessel-related, does it? The Supreme Court uses the term vessel-related. But it's talking about the vessel, like its capacity, its mass, its number of passengers. It's talking about the vessel. Is it talking about a private entity like your client that's not a vessel? Yes, it is, Your Honor. And how so? The Supreme Court explained that the held that the passenger was subject to the protection of the Tonnage Clause in the passenger cases 165 years ago. And in Polar Tankers, the Supreme Court went out of its way to reaffirm that it stood firmly on the principle in the passenger cases. And there's nothing in your complaint that says that the fee that your client had to pay for those leases, that extra lease amount based on the cargo, has been passed on, quote-unquote, to the vessel. There's no paragraph I should be able to know that from. Yes, Your Honor. We alleged that the fees were passed on in multiple locations. They're set forth in our brief. But first No, I'm not going to complain, because that's the pleading that the district court judge had. So focus in on the complaint. Yes, Your Honor. Paragraph 25, paragraph 63, paragraph 75, paragraph 77. The complaint very specifically alleges a pass on in multiple respects, with the port authority. So if your theory is that if an entity has, who is working at the port, has to pay a fee, and that entity passes it on to the vessel, that makes the fee improper. Is that your position? No, Your Honor. Those are not the four criteria. The Supreme Court laid out four criteria. Is it imposed by a state entity? Is it vessel related? That is, is it for the purpose of trading in the port? Is it based on a factor related to tonnage, and is it excessive? Those are the four criteria. There's no doubt that we alleged fees in the complaint. The court below didn't suggest otherwise. It didn't argue with us. When you say there's no doubt fees were alleged in your complaint, in fact, your position is you didn't have to allege. You say now that you did, right? But your position in your briefing consistently is you didn't need to allege any pass through, because the penalty against you was in and of itself enough. Isn't that right? It's our position, Your Honor, that it's not necessary to allege a pass through, because the constitutional structure presumes the pass through. That's what the Tonnage Clause is about. The Tonnage Clause is aiming to protect the pass through to the goods, the inevitable pass through of the goods that the Constitution presumes. That's exactly what the Supreme Court explained in the passenger cases. Why are passengers protected by the Tonnage Clause? Because the fee will inevitably reach the goods. The same occurs here, where this is the only thing the Port Authority allows us to do at the terminal, is berth vessels and load and unload cargo. So my question to you is, your legal position is we didn't have to say anything about passing this charge on to our customers, because the Tonnage Clause cases make it clear that as long as there's something happening that is varying in terms of a charge associated with the volume of the cargoes coming in, and other prerequisites you've noted, those other three things, then that's enough. That's sufficient for purposes of the allegations and the complaint. Yes, Your Honor. No question about it. The District Court seemed to say that you didn't have standing. Your Honor, with all respect to the District Court, we believe that the District Court confused pleading with standing. We explained that in our briefs. We believe that the complaint alleged that we are injured. We have to bear these excessive fees. We have to pay them. We are legally liable to the Port Authority to pay these The fees that we pay are excessive and they are used by the Port Authority to subsidize our competitors, and so we suffer economic damage as a result. I think that even though they inferred that you didn't have standing, they may have been talking about prudential standing as opposed to constitutional standing, and then they went on, the District Court went on and decided the case on the merits. But here, don't you really have to allege that you have what's known as third-party standing? You didn't brief that, but isn't really the way in which you can effectively make this claim is to show that you have third-party standing for the vessels who are actually paying this additional through-out charge? Well, Your Honor, we believe that we have alleged facts sufficient to tell you it's called the throughput fee. There are throughput rents. There are volume guarantees. There's a cargo facility charge. There are multiple volume metric charges. You didn't talk at all about third-party standing. There is some law on that, and third-party standing says that you have to suffer injury. The plaintiff and third-party have to have a close relationship and the third-party must face some obstacles that prevent it from pursuing its claim. So, you know, focus on those last two. How is your relationship that close, and what are the obstacles from precluding the vessel owners from coming in and saying to the Port Authority, hey, that's an illegal punnage fee. We don't want to pay it. Well, Your Honor, as you know, we didn't brief this, and the Port Authority didn't argue that we had to make this argument. But the standing issue is floating here throughout the case, so let's get to it. Yes, sir, Your Honor. We've alleged standing in the complaint in our briefs explain that we have, first of all, directly injured ourselves. We've paid tens of millions of dollars a year in excess fees. We are legally obligated to pay the Port Authority. That's the first point. So we sustain direct injury. Additionally, the Port Authority uses this money to subsidize our competitors. So our business sustains economic damage as a result of the Port Authority's regime, which collects these fees and then gives it to our competitors. That's a direct economic damage. So we sustain direct economic harm through excessive fees and through the injury to our business as a starting matter. So there's no question about direct injury. Now, with respect to vessels and why vessels have elected not to challenge the Port Authority, I can only say that it's standing here today that it's not a simple thing to challenge the Port Authority of New York and New Jersey. And MAR is exactly in the best position to do the challenging because MAR actually services hundreds of vessels and millions of containers. Can you identify any case where any entity, like your client, other than a vessel, has tried to invoke the Protection of the Tundish Clause? Well, Your Honor, of course, it all boils down to which entity, but like our client. Well, something that's not a vessel or not a vessel owner or not a passenger. So a private entity that provides service at the port, landside service at the port. Well, Your Honor, it depends how you read Alaska Riverways. Give me your best case that it doesn't involve a thing that floats on water that allows you to invoke the Tundish Clause. Give me your best case. I don't mean like facts. I mean like a case with a name and maybe a citation. Your Honor, we don't have any case in which a stevedore has brought a Tundish Clause action. However, if you take a look at Alaska Riverways, you see that their claim is based upon the fact that they were a lessor of a state shoreline, not because they operate vessels. It was in their capacity as a lessor of a shoreline that they had standing to bring the claim against the State of Alaska. And in that case, the State of Alaska said, you're not a vessel operator. You're a lessor of shorelines on the land because it knew the vulnerability it had under the Rivers and Harbors Act. So it attempted, the State of Alaska, attempted to characterize Alaska Riverways as something like MAR, something which operates a terminal on the waters that it rents and leases from the Port Authority. So that's awfully close to us, Your Honor. And then Bridgeport. There's focus in Bridgeport about it being a ferry company, but it was a ferry company that was leasing the dock. And it was because of its concession. But that gave them access to the port. Your client, the three points they talk in Polar Tankers, where they talk about trading in, and it's not trading, it's access to, residing in, I can't remember the three points. You're making a levy for the privilege of trading in a port. Yep. Lying in a port, trading in a port. You're not lying in the port. So you're focused on the trade. We are lying in the port. We rent the water from the Port Authority. You rent the water? The water area is included in our lease. We are, we are, we are the water. Oh, oh, okay. Now, that's a big, you are the water. Let me, if I can. You have a meets and bonds description that takes you into water, is what you're trying to say. Indeed, Your Honor. Okay. Let me ask you a question or two, if I might, about your statutory claims, okay? Unlike the Tunch Clause, the statutory language seems to be specific in saying that it's collected from any vessel or watercraft or its passengers or crew. You'd acknowledge, wouldn't you, that that language goes beyond the Tunch Clause, and in fact, your Tunch Clause argument is very largely devoted to the point of saying the Tunch Clause doesn't require that. It just requires somehow that the actions of the Port Authority hit the cargo, the importing and exporting. Am I correct about that? Your Honor, the question of the scope of the RHA vis-a-vis the Tunch Clause is an interesting one. Courts that have discussed it have referred to it as a codification of both the Tunch Clause and the Commerce Clause. And its scope seems to be... It's got added language, doesn't it? It does, Your Honor. And, for example, the language collected from is very interesting because that's exactly what the Port Authority does here. It collects the money from the vessel. So your argument that it doesn't matter whether we alleged pass-through, because that could be presumed, that doesn't count when we get to the statutory claims, does it? Because you don't get that presumption there. Given the statutory language, it talks about collecting from the vessels, right? Well, Your Honor, our allegations are that they do collect the fees from the vessels. I've read 63, I've read 25, I've read 75, I've read 77. With all due respect, I'm not sure how... I mean, you certainly say we get money collected from us, we charge our clients. That's what you say. You're asking us to make an inferential step, which is that in our charging our clients, we are passing through things that were collected from us. But I'll ask you to point us to anywhere in your brief where that language of the clarity I just attempted to use is in your complaint. Because I didn't find it. I saw you say, they charge us money, we charge our clients money. And now you argue there's an inference that there's a pass-through. But I didn't see anywhere where you say, and as our charge goes up on directly to the vessels. Is that in the complaint? Not in those words, Your Honor. You're absolutely right. Those words are not in the complaint. The complaint says this is our only business. This is the only thing we're allowed to do. So it's quite a reasonable inference to infer that the collection of the fees that we must pay the Port Authority are collected from the vessels. We think that's quite a reasonable inference on the 12b-6. We think we should have gotten that inference. But additionally, the cargo facility charge is referenced in the complaint by reference to the tariff. And the cargo facility charge is a levy by the Port Authority directly on the vessels. But isn't the vessels the only one that can seek relief for that levy? How can your client seek relief for that? They can seek relief in the same way that in Bridgeport, the ferry operators sought relief because it was required by the Port Authority to collect the passengers free from the passengers. That's not what your case is about. You're alluding to that. Now, if we said that the cargo facility charge was an illegal tonnage fee, you're not going to be very happy with that outcome. We're challenging it, Your Honor. We are saying it's an illegal tonnage fee. Okay. But we're also saying that there are others which we specify as well. You're saying there are others.  I'm sorry, Your Honor. Okay. You're saying there are others. There are others. Yes, sir, Your Honor. And they're volumetric. You're not claiming that the basic rent. I mean, there's the basic rent. You're not talking about that at all. We are talking about it, Your Honor, because the basic rent requires that we pay a minimum volume guarantee of 400,000 containers a year. Volumetric guarantee. If we don't make the volume guarantee, we lose the terminal, Your Honor. Okay. That's in addition to the throughput charge. Yes, Your Honor. Let me ask you this. Their rents are volume-based. Excuse me, Your Honor. So all the rents are volume-based. Whether they call it a throughput or not, it's volume-based. They are volume-based. So how come you didn't share this? This has got a big constitutional question in front of it. Where has your client been? I know there's always a laches argument before the district court, I think. And I understand that every time you pay the rent, it could be continuing harm to your client. But if you're saying even the basic rent, because of the way it's calculated, violates the Constitution, why years have passed? And it only really came to fruition as a dispute, it seems to me, from reading the chronology, when those additional throughput charges started to increase. And then the dollar figures got to be large enough that one could suggest that maybe the business took a look and said, well, we negotiated something that is far greater than we expected. So is there any explanation you can give us where everybody's been if this was such an improper fit? Your Honor. Starting from the basic rent. Your Honor, the volumetric requirement of the basic rent didn't kick in until 2008. So the rent was just a flat fee? It didn't matter how much? Until 2008, that's when the throughput requirement went into effect. But I think you said, is that different? Is the basic rent different than the throughput? It is. It is there, right? Yes. Okay. Basic rent is based upon satisfying the volume guarantee for throughput. So you're saying that you didn't have any obligation to pay any dollars until 2008? No, I'm saying that the connection to the throughput, the volumetric, the calculate kicked in in 2008. I'm with you on that. I'm with you on the basic. Yes, Your Honor, that's correct. All right. We'll have you, Mr. Kern, we'll have you back on rebuttal. Thank you, Your Honor. Mr. Isikoff. Good morning, Your Honors. Peter Isikoff of Weill Gotchel and Manjis for the Port Authority of New York and New Jersey. I guess a couple things that just need correction, just right from the outset. First of all, the base rent is not volumetric. It is a per acre rent. It is fixed. It started at $39,000 an acre from day one on October 1, 2000, and is subject to a 2% escalator. I don't understand how that's volumetric base. There is also a terminal guarantee, which requires a certain level of activity, but that has nothing to do with how the rent is calibrated with respect to base rent. But let me just start by saying that this is a case about negotiated rental payments by a land side stevedoring business pursuant to a negotiated lease. We've read your briefing and have an understanding of your position. What I'd like you to do is to meet some of the arguments that have been made by your opponent. First and foremost, the argument that they have made, which is it doesn't advance the argument for you to say they're stevedores, they're not a vessel, because ship's captains aren't vessels, supercargoes aren't vessels, passengers aren't vessels. In all these instances, the Supreme Court has been playing and saying they don't care whether you get at the tonnage directly or indirectly through these other vehicles, so stevedores should be no different. What's wrong with that argument that you've just found one other indirect route, like other indirect routes which have been roundly rejected? First of all, let's go back to what the tonnage clause says and what it prohibits, and what has been held to prohibit, and not just based on the language alone, but on 225 years of Supreme Court history. It is a tax or a duty that is imposed by a governmental entity on a vessel for entering or trading in a port. Let me just break it apart just for one second. The clause doesn't really use the word vessel. No, but tonnage is directly referred to vessels, and every single Supreme Court case that they cite talks about vessels, whether it's polar tankers or Clyde Mallory or the passenger case. All of them are very much focused on vessels because the tonnage clause was adopted at the Constitutional Convention because they were concerned that this might be an end run around the import-export clause, and this is what they chose. Mr. Isaacoff, I'm hoping to get you to come to my question. My question is, we've got the background. We've read it. We understand it. Their assertion, and this is what I want you to meet head on, their assertion is a stevedoring company stands in exactly the same position as a super cargo or a ship's captain or a passenger in the sense that once a governmental authority like the Port Authority decides it's going to hit us with a volumetric charge, they are effectively going after the tonnage, and that is a violation of the tonnage clause. I need you to meet that argument. All right. First and foremost, that goes well outside 225 years of litigated history. I understand that indirect can mean indirect, and the question is, is there any limit to it? Okay, and so I appreciate that there is no case that has specifically held in a stevedoring context. Stevedores are outside the purview of the tonnage clause because nobody has ever thought that they possibly could be within it. Well, but I'm not sure, you know, when you say nobody ever thought that, I'm not sure that nobody ever thought that, but whether anybody thought of it before or not, that's the argument we're given, and I'm trying to get you to respond to this specific argument that there's no logical difference between a Supreme Court case that says you can't charge the ship's captain, you can't charge the super cargo, you can't charge the passengers. There's no logical difference between those cases and you can't charge the stevedore. I'm trying to get you to say what is the logical difference. Don't take me back 225 years. Talk to me about the logic of that position, please. All right. First of all, and there are several elements to a tonnage clause violation, I want to talk about them because it's going to be relevant to why it doesn't apply here, okay? And the first is that it must be a tax that is imposed by a governmental entity, and no matter what you say in terms of this indirect aspect and whether they could be within or without it, none of the charges that Mara is talking about were imposed on it. They were all negotiated. Okay. I'm making a factual distinction, and let's accept for the sake of argument that just for purposes of argument, let's say we accepted their assertion that this fee is a disguised tax. So it is a tax. Take your next step. Okay. Then the question is, is it tonnage? And how can you tell it's tonnage unless you know whether it is ever going to get put on the vessels? And their response, as I understand it, to that is, and I don't mean to put words in their mouth, but along the lines of, hey, you can infer something and understand something from the words cargo throughput. They wouldn't call something a cargo throughput charge if it wasn't volumetric. Well, first of all, based on the volume of the cargo, that's why they call it cargo throughput. Right. The cargo throughput rent, okay, is one component of this lease. It's a 200- or 300-page negotiated lease. It's one aspect of the rent. It has a minimum required throughput rent even if the cargo doesn't come through. So it's not strictly volumetric in that sense. They have a guarantee. But there's a volumetric aspect to it, right? Okay. It does have a volumetric aspect to it, and the reason it has a volumetric aspect is because it is a measure of the activity occurring on the Port Authority's property, which there are reasons to do that that has nothing to do with tonnage. It has to do with, you know, can MAR afford this rent? The more cargo they put through, the more activity they have, the more revenue they have, the fairer it is to have their rent increased. We're in a 12b6 context here. They've alleged that the volumetric throughput charges are unrelated to services. For purposes of review, we and the district court are required to accept that as true, correct? I mean, you've just made an argument that. I don't know how that can be accepted as true because the lease is part of it. Because we're in a 12b6 context. That's right, and the lease is something that the court can and, frankly, must look to because it's an essential document referenced throughout the complaint. And in terms of services, they get to rent 445 acres of prime wharf land. Okay, maybe I misunderstood. Okay, so there's no question in terms of what they get for it. Stolzkoff, can you stop at that point? That's the base rent. Okay, it's a complex lease. There's a base rent provision. But this throughput charge, which Judge Jordan has said, and you agree, is volumetric. To some extent, yes. It doesn't go to the cost of operating the facility. It goes to the amount of tonnage that's being brought in on that vessel. Well, there's two different ways you could run a lease like this. You could either make it all or several. You could make it either all just pure acreage and you multiply it. You could make it all volumetric. This is a combination. And if for some reason the parties have decided let's not do any kind of a throughput rent, then they inevitably would have had a higher per acre rate. Okay, but that's not what we have here. I mean, you can come up with counterfactuals, but we've got to deal with the factual we've got. The factual we've got is you've got something beyond the basic rental charge, a cargo throughput charge, which is volumetric at least in part in nature, and as to which you charge them increasing amounts of money, which they allege are unrelated to the service levels provided to them. So it doesn't advance your argument to say they're getting something for this because that's a factual question, which at this stage we can't answer except to say we accept the assertion made in the complaint that that's not so. It's purely a volumetric charge for which they're not receiving additional services. So accepting that that's true, take us the next step. Why is this not like the other cases where the court said you can't do it indirectly? Because the other cases when you say you can't do it indirectly, they are so directly involved with the vessel itself, the passengers that are on the vessel. Alaska Riverways, which Mr. Kern referred to, was a tour operator running vessels on the river. You talk about the supercargo. That is an officer that is in charge of the cargo that is on the ship, the vessel owner. I mean, what could be more of that? It's just saying that you can't go slightly to one side. And what could be more related to the cargo than me? I'm the one who's working right there at the berth taking the cargo off the ship. I'm unloading the cargo. I'm as directly related to the cargo as you can get, except being in the cargo bin container itself. I'm putting stuff on. I'm taking it off. That's my job. But the stevedore is not being taxed for the privilege of entering or lying in port, and that's what the tonnage clause prohibits. Yeah, but the stevedore in this case is saying they are indirectly making that happen because indirectly the charges we're getting that are volumetric are presumed and certainly will be passed through to the people who are lying in port. That's the nature of the argument I understand them to be making. Well, I understand that they've made that argument, but as Your Honor correctly pointed out in questioning Mr. Curran, they do not allege that in the complaint because it's obviously not true or they would have. It's not true. Actually, when you say it's not true, it's not meeting one of their primary arguments. Their primary argument is we never had to allege that it would be passed through because the tonnage clause cases tell you, court, you can presume, indeed you must presume, that if a volumetric charge hits some ancillary player, it's going to be passed through. And the economics of that would make some sense too, would they not? I mean, does it not make sense that as their charges go up, their clients' charges go up? Let me answer that in two parts. First of all, in terms of what the Constitution presumes, it presumes that a charge to a vessel will get passed through. It does not presume that people who deal with vessels, that that charge will get passed through. It's not part one because it sounds like you're just alluding the cases like Bridgeport Ferry, the cases like the passenger cases, the cases where the Supreme Court has said it's not just vessels. It's things associated with vessels which are going to end up getting charged back to the vessels. Well, they're so closely associated with vessels that it's quite different from a third-party business. And in terms of what the third-party business is going to do, third-party business is in competition with other third-party businesses, and whether it will or won't pass on any particular charge is going to depend on market. And they don't allege it because it's not how they operate their business. If they pass through the throughput, then you would have seen something which they could have alleged, if it was true, that in 2008 when they started paying it, here's this surcharge for the throughput rent we're suddenly being obliged to pay. If it was true that they did that, you would have seen that in the complaint, and you don't see it in the complaint because it's not true. So let's say this lease did not calibrate the additional fee based upon cargo, just had a flat amount that changed over time, which is an extra surcharge. We don't calibrate it to cargo. It would have just been some kind of an escalator. Something like that. Would it be your view, then, that Steve Doerr couldn't come in here and say that violates the tonnage clause because we, Steve Doerr, decided to pass it through because it's not correlated to anything related to the vessel? We certainly would say it doesn't violate the tonnage clause. So you're understanding your adversary's best argument is this is a problem under the tonnage clause because the way the dollar amount is calculated is based upon the volume of cargo? Well, that's certainly the point that they emphasize now in their briefing. But let me talk one second about the cargo facility charge, which Mr. Curran throws in here as if they pay it, which they don't, as if they had argued this to the district judge, which they didn't. It is alluded to only in the most tangential possible way in paragraph 25 of the complaint where they cite the tariff, which, incidentally, was not made part of the record in the district court, is before the court on appeal. In no place in their opposition to our motion to dismiss before Judge McNulty did they raise anything about the cargo facility charge. They now raise it and say that they're injured because they have an administrative job collecting it and this collection burden is falling on them. They don't allege that in the complaint either. If you look at page, I believe it's 15 of their reply brief, they refer to paragraph 3 of the complaint. I would ask the court to read paragraph 3 and see whether it's saying they're complaining of their own levying and collection burden. So I didn't want to let today pass without that. Can you turn to your own brief at page 28? 28, Your Honor? Yeah, note 16. Where you give us an example of why Mar Terminal's theory is unworkable and limitless, an example of electricity expenses. I thought that was actually a helpful idea to work with to see if there's some difference here. Isn't there a distinction to be made because electricity usage would go up as you need to use more power and so naturally there would be increased electrical charges. It would be related to the level of services, in other words. Their argument is the tonnage charge goes up, or the rental charge goes up on a cargo throughput basis. Not because we are using any more services from the Port Authority. In fact, they explicitly deny that in the complaint. But simply because the volume has increased. By your own example, isn't there a limiting principle there? Isn't there a distinction there? Your Honor, with all respect, I think that cuts out a lot of what the elements of the Tonnage Clause violation would require. And it reduces it to something. I'm not disagreeing. And I haven't lost, please don't misunderstand me. I have not lost track of your arguments about it's a fee, it's not a tax, and other things you have noted. I'm just trying to get you to focus on the example you gave and try to put it on a par. In terms of the logic of as more cargo goes through, are they receiving more services? As more cargo goes through, that cargo has got to go somewhere. It's going to either go on rail or it's going to go on trucks that are on Port Authority property. If the Port Authority is responsible for servicing the berths and the waterways and so forth, obviously as more cargo goes through, everybody in the port is going to be more busy. So in terms of the logic, it's pretty much the same as electricity. So in that sense it's the same. But what you have here is you have a private business that is perfectly free to charge its customers as much or as little as it wants. You could say that about a ferry operator too, couldn't you? Well, if you're talking about Bridgeport, I believe that they were obliged. There was a fee on the ferry and they were also obliged to collect from the passengers. And they also, in that case, in the Bridgeport case, they did allege that they were damaged by that. Right. Okay. I'm with you. Thanks. All right, Mr. Isaacoff, your time is on. Thank you. We'll have Mr. Kern back on rebuttal. Mr. Kern, we gave you some substantial time on your initial arguments. Thank you, Your Honor. I'll keep it brief. I wanted to first address Judge Warch's question about trading in a port. I think this is one of the key limiting principles of a tonnage clause and why, for example, it doesn't apply in all kinds of other settings. It relates to a vessel-related matter. There's no question about it. Our complaint is laden with multiple references to the fact that we berth vessels, we load and unload vessels. And without the ability to berth at our dock and load and unload vessels, there would be no point to trade in the Port of New York. So our relationship is as close to the vessels as it can be. What if this lease, though, didn't have this acceleration of expense over time tied to volumetrics of the cargo and simply was a fixed number? You couldn't come back and complain about that under the tonnage clause, correct? You make a very good point, Your Honor. Obviously, we don't have that situation here, and I don't know what other devices the Port Authority might resort to in order to escalate our rent. But the fact of the matter here is that all of the components of our rent are directly volume-related, the throughput mat, the CFC, the volume guarantee. Wait, wait, wait. You heard Mr. Isikoff. I'm sorry, sir. I want to say Isikoff, and if I mispronounce that while you're at the podium, I apologize. You heard Mr. Isikoff stand up and say very explicitly that the base rent, the basic rent, is not volumetric. There is a minimum volume they've got to do or they lose the port, but there's nothing that varies with volume. It's just it's a base rent, and they've got to stay busy or they lose it. Use it or lose it. What is the tonnage clause about that? Well, from our perspective, Your Honor, losing the lease is the ballgame. It's a pretty important thing, but it doesn't vary with the rent. You've got a certain level of business you've got to do, and that's not an uncommon commercial lease provision, is it? Do you really want to stake your case on the basic rent, or are you better off fighting on the cargo throughput? Well, Your Honor, our case is based upon all of the volumetric components of the rent because we believe they're plainly unconstitutional, and the basic rent is connected to a volume guarantee. There's no question about it. If we don't meet the volume guarantee, we lose the lease, Your Honor. So your argument really is that they're not allowed to put any provision into a basic rent that says you have a certain level of activity that's required on this port. No, Your Honor, that's not our position. That is your position. It just said the only component of this rent on the basic rent side is a certain minimum level threshold of activity. Are they wrong about that? There is no prohibition against a volumetric rent if it's not excessive to the cost of the service provided, Your Honor. That's the fourth component of the four-part testament of the tonnage clause. It doesn't vary. As they've described it, it doesn't vary with volume. It's a straight statement of activity level at a minimum that has to be maintained. There's no escalating or deescalating. You've got to have this going on. And if we don't meet it, we lose the lease. So it goes from $50,000 an acre to zero. So it varies. Your Honor, I don't understand the law. I don't understand it. It's your case. Argue it how you want. I'm not sure why you're planting your flag there. I think Judge Jordan is trying to help you to try to get you to hone in more on what parts of your lease are objectionable under the tonnage clause. And that's what you should focus on in your remaining one minute, three seconds. Thank you, Your Honor. No question, Your Honor, the volumetric fees, which are excessive to the cost of the service provided, are the heart of our claim. There's no question about that. And our complaint lays out the throughput rents and the other volumetric rents, which we're required to pay, which we are in no relationship at all to the service provided, which is the letting of the land and the water area. That letting is done when the lease is agreed to. And the cost of the Port Authority of providing the letting does not increase over time. But the Port Authority has imposed on MAR, through its monopoly power as a state entity, this regime which requires the fees to continue to escalate far beyond the cost of providing the letting. And it takes that profit, that surplus, and it subsidizes MAR's competitors. And through this mechanism, we are damaged. We are injured directly. This is not a third-party situation. We are a first party who's damaged. But the situation would be the same if it was not tied, from your point of view about injury, the situation would be the same if the increased expenses was not tied to cargo, right? No, the test requires that it has to be based on a factor related to tonnage. That's what the Supreme Court said. Right, so you wouldn't be here but for this volumetric component of the lease on a tonnage cost claim, correct? We believe that because the fees are based on a factor related to tonnage, the tonnage cost is implicated. No question. All right, Mr. Kern. We thank you for your argument. Thank you very much. We thank both counsel for their arguments. And we'll take what's a very interesting question under advisement.